UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD MATHIS,

    Plaintiff,

Case No. 1:13-cv-187

Hon. Gordon J. Quist

v.

UNKNOWN SUDHIR, *et al.*,

    Defendants.

_____/

**REPORT AND RECOMMENDATION**

    This is a civil rights action brought by a state prisoner incarcerated by the Michigan Department of Corrections ("MDOC") pursuant to 42 U.S.C. § 1983. This matter is now before the court on motions for summary judgment filed by plaintiff (docket no. 29) and defendant Bhamini Sudhir, M.D. (docket no. 32).

    **I.**    **Background**

    Plaintiff's complaint named two defendants, Dr. Sudhir and Dr. Kenneth Jordan. Compl. (docket no. 1). The Court previously dismissed defendant Dr. Jordan from this action, as well as all of plaintiff's claims against Dr. Sudhir except "the claims regarding delay of treatment from March 17, 2012 to March 21, 2012." *See* Order (docket no. 25 at p. ID#284). The relevant allegations are set forth below. Plaintiff is a state prisoner confined by the MDOC at the Lakeland Correctional Facility ("LCF") in Coldwater, Michigan. Compl. at ¶ 4. In February 2012, plaintiff developed a problem producing urine. *Id.* at ¶ 5. On or about March 17, 2012, plaintiff was sent to the LCF health care service for emergency treatment because he had difficulty producing urine which caused him severe pain. *Id.* at ¶ 7. At that time, plaintiff saw a nurse who attempted to insert a

catheter into the stem of his penis. *Id.* at ¶ 8. However, the catheter would not go in all the way to release the urine. *Id.* According to plaintiff, Dr. Sudhir advised him that he had a "stricture" and needed to be sent out of LCF for treatment. *Id.* On March 21, 2012, plaintiff was sent to health care services where a catheter was placed into his penis to remove the urine so that he could go to sleep. *Id.* at ¶ 9. However, contrary to Dr. Sudhir's earlier statement, plaintiff was not sent to an outside facility for treatment. *Id.* at ¶ 10. Rather, the next day, Dr. Sudhir told plaintiff "that something else was the problem and she would not authorize any more treatment other than providing [p]laintiff with a different medication." *Id.* Plaintiff was treated by four different types of medications, none of which worked or relieved the pain. *Id.* at ¶ 11. Despite the medication, he could not produce urine and remained in severe pain and suffering. *Id.*

Sometime in May 2012, plaintiff was referred to an outside specialist. *Id.* at ¶ 12. On June 7, 2012, the specialist, a nephrologist,[1] requested that a cystoscope[2] be performed. *Id.* at ¶ 12. On June 8, 2012, plaintiff was sent to an urologist and told that he would be back in two weeks for treatment. *Id.* at ¶ 17.[3] The cystoscope test was completed on August 6, 2012, with recommendations for medications based on the test results. *Id.* at ¶ 12. Plaintiff alleged that on the same date, he went to an urologist who told plaintiff that he did not have a stricture. *Id.* at ¶ 18.

---

[1] A nephrologist is an expert in the study of nephrology, which is defined as "scientific study of the kidney, its anatomy, physiology, pathology, and pathophysiology." *Dorland's Illustrated Medical Dictionary* (28th Ed.) at p. 1109.

[2] A cystoscope is defined as "an endoscope for visual examination of the bladder." *Dorland's* at p. 421.

[3] The medical records reflect that the nephrologist and urologist were the same person. *See* discussion, *infra*.

Rather, plaintiff had prostate problems, needed a biopsy, needed blood tests, and was given medication. *Id.*

Plaintiff set forth eight causes of action in his complaint. All of these have been dismissed except Count One, in which plaintiff alleged that Dr. Sudhir was deliberately indifferent to his serious medical needs when the doctor delayed in treating his urinary problem "which delay caused further harm and [p]laintiff had to be seen within a one week period." *Id.* at ¶ 27. Plaintiff seeks compensatory damages, punitive damages, and injunctive relief, asking that the Court issue an order that defendants "provide a proper diagnosis" and examination by a specialist in the field of urology. *Id.* at p. 8.

## II.   The parties' motions for summary judgment

### A.   Legal standard

Plaintiff and defendant Dr. Sudhir have filed cross-motions for summary judgment on his remaining claim. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

3

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

      **B.**     **Discussion**

      **1.**     **Plaintiff's Eighth Amendment claim**

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

4

It is well established that an inmate has a cause of action under § l983 against prison officials for deliberate indifference to his serious medical needs, since the same constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. Thus,

> a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle*, 429 U.S. at 106.

"[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). *See Clemmons v. Bohannon*, 956 F.2d 1523, 1529 (10th Cir. 1992) ("the Eighth Amendment does not apply to claims based on inadvertent failure to provide adequate care, negligent misdiagnosis, or an inmate's difference of opinion with medical personnel regarding diagnosis or treatment"). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

In addressing Eighth Amendment claims, the Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). As discussed in the previous Report and Recommendation (R&R), plaintiff does not allege that he had a complete denial of medical care. Rather, plaintiff alleged that he received substantial treatment from LCF health care personnel from March 17, 2012 through January 16,

6

2013, which included multiple examinations, catheterizations, medication, referral to a specialist, laboratory tests, and a cystoscope test. *See* R&R (docket no. 21 at pp. ID## 249-51).

"[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004), quoting *Westlake*, 537 F.2d at 860 n. 5. While plaintiff disagrees with defendants' medical judgment and wants to have treatment contrary to that judgment, this disagreement does not rise to the level of a federal constitutional claim. *See Woodberry v. Simmons*, 146 Fed.Appx. 976, 977 (10th Cir. 2005) ("a difference of opinion between a prisoner and the prison medical staff about medical treatment does not constitute deliberate indifference"); *Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"); *Wright v. Genovese*, 694 F.Supp.2d 137, 155 (N.D.N.Y. 2010) ("[d]isagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment"). Here, plaintiff claims that Dr. Sudhir was deliberately indifferent to his serious medical needs because the doctor delayed treatment after plaintiff first suffered his symptoms on March 17, 2012.

   **2.   Discussion**

In her affidavit, Dr. Sudhir gave a detailed description of plaintiff's treatment received from March 17, 2012 through March 22, 2012. *See* Dr. Sudhir Aff. (docket no. 32-1). The doctor's

affidavit included references to plaintiff's medical records which were filed under seal. *See* Medical Records (docket no. 36). Dr. Sudhir summarized the treatment provided to plaintiff when he initially complained about his urinary problem on March 17, 2012:

> 7.      On March 17, 2012, Mr. Mathis presented to healthcare reporting problems voiding since December of 2011, and that he had been unable to void that day, and when he did, he would dribble for an hour and not empty his bladder. [MR-26.] [ID# 376] The previous day, Nurse Practitioner Ingraham had increased Mr. Mathis's dose of Hytrin, a medication designed for the treatment of an enlarged prostate, from 2 mg to 5 mg. [MR-24.] [ID# 374] On March 17, 2012, Mr. Mathis saw Nurse Parrish, who consulted me. [MR-26 to 27.] [ID## 376-77] I performed a prostate exam, and Mr. Mathis voided 250 cc of urine for a specimen with dribbling noted thereafter. [Id.] A full bladder typically contains around 400 cc's of urine. Nurse Parrish noted that the catheter did not reach past a certain point. [Id.] Mr. Mathis also had no white blood cells or blood in his urine (ruling out infection), and his prostate was enlarged, smooth, and non-tender. [Id.] Mr. Mathis's skin turgor was normal, suggesting he was not dehydrated, and there were no abnormal bowel sounds, which assisted in ruling out other pathologies in the abdomen. Likewise, the abdomen was non-tender. If it was distended, or there was pain on palpation, this could signify an abnormal retention of urine. The urine dipstick came back normal, which informed the nurse that there was likely not a bladder/urinary tract infection.
>
> 8.      On March 17, 2012, Nurse Parrish appropriately referred Mr. Mathis to me, provided education, and instructed Mr. Mathis to put in for sick call if symptoms did not subside or they became more severe and continue medications. [Id.] She also provided him incontinence pads. [Id.] I requested that Mr, Mathis be rescheduled for another exam with the intent to refer him to urology. [MR-26 to 27.] [ID## 376-77] At that time, Mr. Mathis was already taking Hytrin, a medication prescribed for treatment of an enlarged prostate. [Id.] He was informed to contact healthcare if his condition worsened or did not subside. [Id.]
>
> 9.      The March 17, 2012 referral to me as the medical provider for a subsequent exam for consideration of a urology consult was proper under the circumstances. Mr. Mathis had no medical need to immediately see a urologist on March 17, 2012 or to be immediately referred to a urologist prior to my examination of him. The failure to pass a catheter was not necessarily determinative of a stricture. This could have been due to the skill of the nurse administering the cath or other factors.

Dr. Sudhir Aff. at ¶¶ 7-8 (Court ID##'s added).

In her affidavit, Dr. Sudhir also summarized the treatment provided to plaintiff for his second complaint of urinary problems. While plaintiff alleged that he went to health care on March 21, 2012 for a catheterization, *see* Compl. at ¶ 9, the medical records reflect that his treatment actually occurred during the early morning hours of March 22, 2012:

> 10. In the early morning on March 22, 2012, Mr. Mathis presented to healthcare with a feeling of abdominal bloating, and difficulty urinating for three months. [MR-28 to 29.] [ID## 378-79] He reported urinating a little at 8:00 PM that night [i.e., March 21st], and then again at 8:30, but was only dribbling. [Id.] Nurse Lindstrom straight cathetered Mr. Mathis and obtained a urine output, and instructed Mr. Mathis to return at 6:00 AM the next morning to be cathetered again, which he declined. [Id.]
>
> 11. In the afternoon of March 22, 2012, I saw Mr. Mathis, at which time he stated that he had difficulty with voiding, had to strain, dribbles with straining, had a sensation of incomplete voiding, urgency and that he had to squeeze out, causing him to wake about twice per night. [MR-34 to 36.] [ID## 384-86] He denied any burning, pain on urination or foul smelling urine. [Id.] After being catheterized, Mr. Mathis had zero post-residual void, indicative that he was not retaining urine. [Id.] I diagnosed Mr. Mathis with probably prostatitis, and ordered by mouth Bactrim for at least four weeks and follow up. [Id.] I also ordered that Hytrin be discontinued, as he reported no effect, and ordered Cardura for symptomatic relief. [Id.]

Dr. Sudhir Aff. at ¶¶ 10-11 (Court ID##'s and dates added).

Dr. Sudhir explained that in her medical judgment, plaintiff did not have an emergency requiring an immediate referral to a urologist:

> I did not believe that Mr. Mathis had a urethral stricture between March 17, 2012 and March 21, 2012, nor did he appear to have a stricture. While a nurse had a hard time passing a catheter on March 17, 2012, Mr. Mathis did, in fact, void a substantial amount of urine, suggesting that he did not have a urinary blockage. [MR-26 to 27.] [ID## 376-77] He also had no signs or symptoms of infection, such that this was not an emergency situation. On March 22, 2012, the medical records reflect that Mr. Mathis had a catheter inserted, which would be contraindicative of a stricture. [MR-28 to 29.] [ID## 378-79]

*Id.* at ¶ 5 (Court ID##'s added). Dr. Sudhir also stated:

9

> The treatment that I provided to Mr. Mathis and the non-referral of Mr. Mathis to a urologist between March 17, 2012 and March 21, 2012 did not cause any harm to Mr. Mathis. Mr. Mathis ultimately was diagnosed with BPH [MR-87] [ID# 437], which is a chronic condition that did not require immediate, emergency care between the dates of March 17, 2012 and March 21, 2012.

*Id.* at ¶ 6 (Court ID##'s added). Finally, Dr. Sudhir explained that the urologist's diagnosis of BPH (benign prostatic hyperplasia) is "a common urological condition caused by the non-cancerous enlargement of the prostate gland as men get older" and that "[m]edications can provide mild to moderate improvement in relief of symptoms, but at this stage, medications are not a cure and they may have to be taken indefinitely." *Id.* at ¶ 4.

Plaintiff submitted an affidavit in response to Dr. Sudhir's motion. *See* Mathis Aff. (July 8, 2014) (docket no. 43-1). In this affidavit, plaintiff stated "[t]hat from the date of 03/17/2012 to 03/22/2012, I suffered both abdominal pain and discomfort, bloating, and an inability to urinate except in dribbles, *and was not provided any medical treatment during this time*." *Id.* at ¶ 2 (emphasis added). Plaintiff's statement that he "was not provided medical treatment during this time" is contrary to the allegations in his complaint, other portions of his affidavit, and the medical records, all of which describe the treatment he received on March 17th, 21st and 22nd. *See* Compl. at ¶¶ 7-10. *See* Compl. (docket no. 1 at pp. ID## 1-9); Medical Records, *supra*; and Mathis Aff. (docket no. 43-1 at ¶¶ 1, 3-4). It is undisputed that plaintiff received medical treatment on March 17, 2012 and the early morning hours of March 22, 2012. Furthermore, plaintiff's complaint does not allege that he sought medical attention on March 18th, 19th or 20th, nor is there any record that plaintiff sent kites or contacted health care on those days. On the contrary, it is undisputed that plaintiff was on medication and told to contact health care if his problem worsened or did not subside. Medical Records at pp. ID## 376-77. Plaintiff cannot claim that he "was not provided any

10

medical treatment" when he failed ask health care personnel for treatment between March 17th and 21st.

Plaintiff's affidavit also states that the nurse (Nurse Parrish) was "was unable to pass the catheter past a certain point to drain the urine," that he saw Dr. Sudhir after the attempt, that after Dr. Sudhir performed the prostate examination, she felt that plaintiff had urethral stricture and needed to see a urologist, and that Dr. Sudhir "was going to refer me to such outside specialist." Mathis Aff. (July 8, 2014) at ¶ 1. Plaintiff's statement regarding referral to a urologist is not inconsistent with Dr. Sudhir's affidavit or the medical records. Dr. Sudhir initially intended to refer plaintiff to a urologist, but then noted that his symptoms were not necessarily determinative of a stricture. Sudhir Aff. at ¶¶ 8-9.

Plaintiff also states that Dr. Sudhir did not examine him on March 22, 2012. Mathis Aff. (July 8, 2014) at ¶ 4. According to plaintiff, the doctor only asked if he "was experiencing a burning or pain on urination," he responded "no", and then "[w]ithout any examination" the doctor stated her belief that plaintiff had prostatitis and was going to prescribe Bactrim for four weeks. *Id.* While the doctor may not have performed a complete physical examination on that date, the undisputed record reflects that she personally observed plaintiff, asked plaintiff at least one question regarding his urination problem, had treated plaintiff only a few days prior to that date, and had access to plaintiff's medical file.

In support of his motion for summary judgment, plaintiff submitted a separate affidavit (dated May 6, 2014) which stated in pertinent part that:

> 1. That in May 2012, I was sent to an outside "Specialist" and he determined that I had a "Prostrate Problem" which required medical treatment. He subscribed a form of treatment to ease the pain, but because of the diagnosis provided

> by Doctor Sudhir, I have not received that type of treatment, or any treatment which stops the pain when I try to urinate.
>
> 2. That I am in constant pain when I try to produce urine and the medication I have been prescribed does not work, nor is it relieving the severe pain when I try to produce urine.
>
> 3. That I have been seen by numerous Doctors and because of the error in diagnosing my problem by Doctor Sudhir, these doctors rely on her error and continue to disregard the type of treatment the Specialist indicated I needed to correct the problem and stop the pain.
>
> 4. That upon my release from prison, I will need acute medical treatment to stop the pain, and I am not sure what will happen when I try to have sexual intercourse with my future spouse.
>
> 5. I have not had any treatment to relieve the pain and I continue to have severe pain when trying to urinate and no one is sure as to what the real problem is, and no one has diagnosed me other than the Specialist whose diagnosis is ignored by the Health Care personnel.

Mathis Aff. (May 6, 2014) (docket no. 30).

As an initial matter, plaintiff's May 6, 2014 "affidavit" is not sufficient for purposes of supporting a motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(4) ("[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"). Here, the notary struck out the reference in the jurat that the affidavit was "sworn to" before the notary. *See* Aff. (docket no. 30 at p. ID# 308); M.C.L. § 55.265(a) (defining a "jurat" as "a certification by a notary public that a signer, whose identity is personally known to the notary public or proven on the basis of satisfactory evidence, has made in the presence of the notary public a voluntary signature and taken an oath or affirmation vouching for the truthfulness of the signed record"). The absence of a jurat or other evidence of verification requires a court to

find that the document fails to constitute an affidavit. *Knobloch v. Langholz*, No. 231070, 2002 WL 1360388 at *2 (Mich. App. June 21, 2002) (unpublished). *See Kelley v. City of Flint*, 251 Mich. 691, 696; 232 N.W. 407 (1930) ("[a] purported affidavit, on which perjury could not be assigned if it was wilfully false, would not, in law, be an affidavit at all"). Accordingly, plaintiff's May 6, 2014 affidavit should be disregarded.

Even if plaintiff's May 6, 2014 affidavit had been properly executed, the statements in the document do not establish a constitutional violation. Plaintiff claims that Dr. Sudhir was deliberately indifferent because she delayed treating a serious medical condition. However, plaintiff's affidavit does not refer to deliberate indifference, but to an alleged "error" by Dr. Sudhir in diagnosing his condition. An alleged error by Dr. Sudhir cannot serve as the basis for an Eighth Amendment claim against her. To establish an Eighth Amendment claim, plaintiff must show that Dr. Sudhir was aware of his obvious and serious need for medical treatment and delayed the medical treatment of that condition for non-medical reasons. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106.

Furthermore, to demonstrate that an alleged delay in medical treatment rose to the level of a federal constitutional violation, plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier v. Madison County*, 238 F.3d 739, 74 (6th Cir. 2001). Here, plaintiff has failed to meet this burden. When plaintiff had problem urinating on March 17th, he was catheterized and examined to make sure that he did not have an infection or a stricture. There is no medical evidence that plaintiff

required an additional catheterization until the night of March 21st and early morning hours of March 22nd. On the contrary, the record reflects that plaintiff refused a third catheterization on March 22, 2012. *See* Sudhir Aff. at ¶ 10.

Finally, plaintiff apparently claims that Dr. Sudhir delayed his treatment by failing to refer him to a urologist on March 17, 2012. Plaintiff has presented no evidence that his condition from March 17, 2012 through June 6, 2012 was so grave as to require immediate treatment by a urologist. Medical records prepared by the urologist, Kevin A. Brewton, M.D., from June 7, 2012, noted that plaintiff had an "[o]utlet obstruction of unknown etiology" and that based upon plaintiff's previous history of sexually transmitted diseases, "he may have simple urethral stricture which can easily be corrected." Medical Record (docket no. 36 at pp. ID## 361-62). However, the doctor wanted to schedule a cystoscopy before instituting any therapy. *Id.* Plaintiff was approved for the cystoscopy which was performed on August 6, 2012, which resulted in a diagnosis of BPH, a common urological condition in older men. *Id.* at pp. ID## 434, 437; Sudhir Aff. at ¶ 6. In summary, plaintiff has not placed verifying medical evidence into the record to establish any detrimental effect due to the alleged delay in medical treatment. *See Napier*, 238 F.3d at 742. Accordingly, plaintiff's Eight Amendment claim fails.

### III.    Recommendation

For the reasons set forth above, I respectfully recommend that plaintiff's motion for summary judgment (docket no. 29) be **DENIED**, that Dr. Sudhir's motion for summary judgment (docket no. 32) be **GRANTED**, and that this action be **TERMINATED**.

Dated: <u>March 20, 2015</u>                         /s/ Hugh W. Brenneman, Jr.
                                                               Hugh W. Brenneman, Jr.
                                                               United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).